MAURICE D. PESSAH (Pro Hac Vice Pending)
*maurice@pessahgroup.com*
JASON H. SUNSHINE (NY SBN: 5652474)
*jsunshine@pessahgroup.com*
**PESSAH LAW GROUP, PC**
661 N Harper Ave., Suite 208
Los Angeles, CA 90048
Tel. (310) 772-2261

*Attorneys for Plaintiff*
DREW AUSTIN SPECKMAN

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DREW AUSTIN SPECKMAN, in both his personal capacity and as sole incorporator of RapStudy, Inc, a Delaware Corporation.<br><br>Plaintiff,<br><br><br>-against-<br><br><br><br>COSIMO FABRIZIO, an individual; REZA MADHAVAN, an individual; and ADRIAN LEE, an individual,<br><br>      Defendants. | Civil Action No.   3:21-CV-0602 (DNH/ML)<br><br>**PLAINTIFF'S DECLARATION IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR: (1) A TEMPORARY RESTRAINING ORDER AND (2) AN ORDER TO SHOW CAUSE**<br><br>[Filed concurrently with: (1) *Ex Parte* Application for Temporary Restraining Order; (2) An Order to Show Cause Re Preliminary Injunction; (3) Memorandum of Law in Support Thereof; (4) Declarations of Jason H. Sunshine and Maurice D. Pessah; Complaint] |

## DECLARATION OF DREW AUSTIN SPECKMAN

I, Drew Austin Speckman, declare:

1.  I am the Plaintiff in this matter, as well as the founder, owner, sole incorporator and Chief Executive Officer of RapStudy, Inc. ("RapStudy" or "the Company"). As such, I am familiar with and have personal knowledge of the facts set forth herein. I make this declaration in support of my Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction.

2.  I am the founder and creator of RapStudy, an educational platform that turns pop songs into a teaching tool by linking the melodies of popular songs with educational lyrics. Lessons on a broad range of topics—from the electoral college to the scientific method—are set to chart-topping hits from artists such as Ariana Grande and Billie Eilish.

3.  The Company is rapidly expanding. With hundreds of songs in its catalogue and a team of 45 members, RapStudy is a business with enormous growth prospects and wide interest from investors, school districts, educators, and music industry executives. RapStudy has over 300 educational partners and is used in approximately 20 schools.

4.  I originated the idea for RapStudy in 2018 while enrolled at Cornell University. I filed a Certificate of Incorporation for RapStudy with the Delaware Secretary of State on November 21, 2019 using my personal funds to pay the filing fee. The Certificate of Incorporation established "RapStudy, Inc." as a Delaware corporation, with me as RapStudy's "sole incorporator." Apart from this Certificate, no other RapStudy documents have been filed with Delaware's (or any state's) Secretary of State. No Board of Directors was, or had been, appointed to date and no Bylaws have been created. Attached **as Exhibit A** is a true and correct copy of the RapStudy, Inc. Certificate of Incorporation.

5.  As RapStudy's CEO, I am responsible for negotiating contracts with school districts,

managing corporate administration, supervising personnel and independent contractors, and engaging executives from the music industry to secure counsel, licensing, investment, and partnership.. In or around October of 2018, I approached Defendant Cosimo Fabrizio ("Fabrizio"), a younger Cornell student, and invited him to join RapStudy as a consultant. On October 28, 2018, Fabrizio signed a non-disclosure agreement ("NDA") identifying me as the "Idea Originator" for RapStudy and himself as a "Consultant." The NDA designates me as the exclusive owner of all information related to the business, including, *inter alia*, proprietary computer code, business processes and customer information, intellectual property, service marks, marketing and development information., accounting information. Attached hereto as **Exhibit B** is a true and correct copy of the Fabrizio Non-Disclosure Agreement ("Fabrizio NDA").

6. The Fabrizio NDA explicitly prohibits Fabrizio from using RapStudy information "for any purpose that might be directly or indirectly detrimental to the Idea Originator [me]." The NDA further prohibits Fabrizio from "interfer[ing] or disrupt[ing] the Idea Originator's relationship with their employees and contractors[.]," and provides that any breach "would cause irreparable injury to the Idea Originator[.]" *See* Exh. B.

7. Between November 5, 2019 and November 12, 2019, I executed similar non-disclosure agreements with Defendants Madhavan and Lee, whom I hired as part-time employees at RapStudy. These agreements designate me as the exclusive owner of all RapStudy property and provide, *inter alia*, that I may "use any and/or all ideas and/or information from any and/or all related conversations and/or communications—past and/or potentially forthcoming—for any and/or all RapStudy-related reasons." Attached hereto as **Exhibit C** is a true and correct copy of the Madhavan NDA. Attached hereto as **Exhibit D** is a true and correct copy of the

Lee NDA.

8. I was involved in a brief, consensual relationship with Claire Choi in early-Fall 2020. Ms. Choi is a Cornell student who joined RapStudy as an intern. Ms. Choi disclosed our relationship to Defendant Fabrizio on April 25, 2021, and to Defendants Lee and Madhavan in a series of conversation between April 25-26, 2021.

9. On or about May 3, 2021, I received a document entitled "Notice of Misconduct" signed by Defendants Adrian Lee, Reza Madhavan, and Cosimo Fabrizio, as well as RapStudy employee Jake McEvoy (collectively, the "Notice Signees"). The Notice accused me: (1) failing to separate work life and private life, (2) exercising poor judgment, and (3) violating Defendants' trust. Neither the Notice nor Choi alleged any unlawful conduct on my part. Attached as **Exhibit E** is a true and correct copy of the Notice of Misconduct**.**

10. Defendants Fabrizio, Lee, and Madhavan demanded that I take a leave of absence from RapStudy until August 8, 2021 and indicated that they were "not comfortable" with my remaining CEO upon returning. The Notice Signees did not articulate any legal basis for their request that I take a leave of absence and step down as CEO. To date, no neutral investigation has been conducted into my consensual relationship with Choi and no evidence of wrongdoing has been furnished.

11. On May 11, 2021, I received a Google alert that my RapStudy Gmail account and Google Drive passwords had been changed, along with the recovery email. Attached as **Exhibit F** is a true and correct copy of my RapStudy Google account login screen as it appeared on May 11, 2021**.** I was thereby locked out of my work email and lost access to the Google Drive in which all of my Company's files are stored. I am the author of many of the files, making them subject to the NDAs that Defendants signed. Without access to such files and my company e-

mail, my ability to discharge my duties and sole incorporator and CEO is significantly disrupted. The result is that RapStudy is being actively deprived of a chief executive, and my hands are tied until Defendants restore my access.

12. Defendants have administrator-level access to the Company's accounts. No other individual holds such access, and such access would be needed to effectuate the change in credentials. Additionally, Defendants have been using RapStudy email addresses, indicating that the system remains functional.

13. On August 3, 2020, I opened a corporate checking account for RapStudy at Tompkins Trust Company (the "Bank Account"). The checking account was registered to RapStudy and was signed exclusively by Plaintiff as CEO. I also opened a bank card under the corporate account, again in my capacity as CEO and sole incorporator. All the paperwork lists me as account holder and includes my signature and mailing address. Attached as **Exhibit G** is a true and correct copy of the Bank Account statement. On September 4, 2021, I added Defendant Fabrizio as a joint signatory to the Bank Account.

14. On May 13, 2021 at around 4:40 pm EST, I attempted to access the Bank Account and received an error message that my login information was incorrect. I then called the Ithaca, New York branch of the bank and was told that my name was not on the account. Later that day, I called the Tompkins Trust Digital Banking Assistance line and asked for more information regarding my restricted access. Once again, I was told I was not on the account. The bank representative refused to provide any further information. It was clear that Defendant Fabrizio had taken unlawful and unauthorized steps to manipulate bank documents and impermissibly disrupt and disable my access to the Bank Account that I created and within which I placed funds.

15. Defendants took further action to cut me out of the Company by revoking my access to the RapStudy GitHub repositories containing the platform's source code. GitHub is a data repository that houses the source code upon which the Company's platform operates. On May 11, 2021, I received an email from GitHub with the subject line "You've been removed from the @rapstudyorganization[.]" The body of the email reads, in its entirety, "You've been removed as a collaborator on rapstudy's repositories. / You no longer have access to the following repositories: / rapstudy.com/rapstudy-web[.]" Attached as **Exhibit H** is a true and correct copy of the email from GitHub dated May 11, 2021.

16. As a result of Defendants' actions, I have been unable to: (1) secure crucial intellectual property rights[1], (2) negotiate contracts with school districts for use of the RapStudy platform, (3) obtain insurance contracts that are vital to the Company's continued operation and mitigation of liability, (4) showcase RapStudy's capabilities in demonstrations with school districts around the country, (5) access and communicate through his Company email, (6) update and manage RapStudy's code, (7) access, maintain, edit and share Company files many of which I own pursuant to confidentiality agreements that each Defendant has signed, or (8) communicate and engage in customer service with existing RapStudy clients.  Without access to the Company bank card, I have been forced to use my personal funds to pay for recently completed songs. Defendants' actions have also stunted RapStudy's active user growth, delayed the release of 20-50 new songs that would otherwise have been commissioned, and upended negotiations with school districts interested in contracting with RapStudy.

17. On or about May 24, 2021, Maurice Pessah, Esq. Showed me the screenshots taken from

---

[1] Because existing hit songs are an essential component to the platform, securing intellectual property rights is paramount to the Company's continued existence. Without such rights, RapStudy would need to discontinue all of its activities.

Claire Choi's Instagram and attached to Mr. Pessah's declaration. I can confirm that the individuals in the pictures are Defendants Reza Madhavan and Cosimo Fabrizio.

18. I now bring this Application for TRO and OSC re Preliminary Injunction in order to restore my access to the RapStudy accounts and prevent irreparable harm from Defendants' unlawful control and mismanagement of the Company.


I declare under the penalty of perjury of the laws of the State of New York and the United States that the foregoing is true and correct.


Dated: May 24, 2021                                         _/s/Drew Speckman_____
                                                                             Drew Speckman, Declarant

**EXHIBIT A**

# CERTIFICATE OF INCORPORATION

## OF

## RAPSTUDY INC.

## A DELAWARE CORPORATION

The undersigned, a natural person (the "**Sole Incorporator**"), for the purpose of organizing a corporation to conduct the business and promote the purposes hereinafter stated, under the provisions and subject to the requirements of the laws of the State of Delaware hereby certifies that:

## I.

The name of this corporation is RapStudy Inc.

## II.

The registered office of the corporation in the State of Delaware shall be 16192 Coastal Highway, City of Lewes, County of Sussex, Zip Code of 19958.  The name of the registered agent of the corporation in the State of Delaware at such address is Harvard Business Services, Inc.

## III.

The purpose of this corporation is to engage in any lawful act or activity for which a corporation may be organized under the Delaware General Corporation Law.

## IV.

This corporation is authorized to issue only one class of stock, to be designated Common Stock. The total number of shares of Common Stock presently authorized is 5,000 (five thousand), each having a par value of $0.0001.

## V.

**A.**	The management of the business and the conduct of the affairs of the corporation shall be vested in its Board of Directors.  The number of directors which shall constitute the whole Board of Directors shall be fixed by the Board of Directors in the manner provided in the Bylaws.

**B.**	Directors shall be elected at each annual meeting of stockholders to hold office until the next annual meeting.  Each director shall hold office either until the expiration of the term for which elected or appointed and until a successor has been elected and qualified, or until such director's death, resignation or removal.  No decrease in the number of directors constituting the Board of Directors shall shorten the term of any incumbent director.

**C.**	No person entitled to vote at an election for directors may cumulate votes to which such person is entitled unless required by applicable law at the time of such election. During such time or times that applicable law requires cumulative voting, every stockholder entitled to vote at an election for directors may cumulate such stockholder's votes and give one candidate a number of votes equal to the number of

1

directors to be elected multiplied by the number of votes to which such stockholder's shares are otherwise entitled, or distribute the stockholder's votes on the same principle among as many candidates as such stockholder desires.  No stockholder, however, shall be entitled to so cumulate such stockholder's votes unless (A) the names of such candidate or candidates have been placed in nomination prior to the voting and (B) the stockholder has given notice at the meeting, prior to the voting, of such stockholder's intention to cumulate such stockholder's votes.  If any stockholder has given proper notice to cumulate votes, all stockholders may cumulate their votes for any candidates who have been properly placed in nomination. Under cumulative voting, the candidates receiving the highest number of votes, up to the number of directors to be elected, are elected.

      **D.**     Subject to any limitations imposed by applicable law, the Board of Directors or any director may be removed from office at any time, with or without cause, by the affirmative vote of the holders of a majority of the voting power of all then-outstanding shares of capital stock of the corporation entitled to vote generally at an election of directors.

      **E.**     The Board of Directors is expressly empowered to adopt, amend or repeal the Bylaws of the corporation.  The stockholders shall also have power to adopt, amend or repeal the Bylaws of the corporation; provided, however, that, in addition to any vote of the holders of any class or series of stock of the corporation required by law or by this Certificate of Incorporation, such action by stockholders shall require the affirmative vote of the holders of at least a majority of the voting power of all of the then-outstanding shares of the capital stock of the corporation entitled to vote generally in the election of directors, voting together as a single class.

      **F.**     Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

## VI.

      **A.**     The liability of the directors for monetary damages for breach of fiduciary duty as a director shall be eliminated to the fullest extent under applicable law.

      **B.**     To the fullest extent permitted by applicable law, the corporation is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the corporation (and any other persons to which applicable law permits the Company to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise in excess of the indemnification and advancement otherwise permitted by such applicable law. If applicable law is amended after approval by the stockholders of this Article VI to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director to the corporation shall be eliminated or limited to the fullest extent permitted by applicable law as so amended.

      **C.**     Any repeal or modification of this Article VI shall only be prospective and shall not affect the rights or protections or increase the liability of any officer or director under this Article VI in effect at the time of the alleged occurrence of any act or omission to act giving rise to liability or indemnification.

## VII.

The corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon the stockholders herein are granted subject to this reservation.

2

**VIII.**

The name and the mailing address of the Sole Incorporator is as follows:

Drew Austin Speckman

111 Dryden Rd, Apt 8K, Ithaca NY 14850

This Certificate has been subscribed as of November 20, 2019 by the undersigned who affirms that the statements made herein are true and correct.

Drew Austin Speckman
**DREW AUSTIN SPECKMAN**
Sole Incorporator

**EXHIBIT B**

# NON-DISCLOSURE AGREEMENT

**THIS NON-DISCLOSURE AGREEMENT (the "Agreement") dated this 28th day of October, 2018**

**BETWEEN:**

| IDEA ORIGINATOR | CONSULTANTS |
|---|---|
| Drew A. Speckman | Raymone Radi and Cosimo Fabrizio |
| ———————————— | ———————————— |
| (the "Idea Originator") | (the "Consultants") |

**BACKGROUND**

**A.** The Consultants are currently or may be employed as employees for the Idea Originator. In addition to whatever role and responsibilities of a potential position(s) (the "Employment"), this Agreement also covers any position or responsibility now or later held with the Idea Originator.

**B.** The Consultants will receive from the Idea Originator, or develop on the behalf of the Idea Originator, Confidential Information as a result of the Employment (the 'Permitted Purpose').

**IN CONSIDERATION OF** and as a condition of the Idea Originator employing the Consultants and the Idea Originator providing the Confidential Information to the Consultants in addition to other valuable consideration, the receipt and sufficiency of which consideration is hereby acknowledged, the parties to this Agreement agree as follows:

**CONFIDENTIAL INFORMATION**

**1.** All written and oral information and materials disclosed or provided by the Idea Originator to the Consultants under this Agreement constitute Confidential Information regardless of whether such information was provided before or after the date of this Agreement or how it was provided to the Consultants .

**2.** The Consultants acknowledge that in any position the Consultants may hold, in and as a result of the Consultants' employment by the Idea Originator, the Consultants will, or may, be making use of, acquiring or adding to information about certain matters and things which are confidential to the Idea Originator and which information is the exclusive property of the Idea Originator.

3. 'Confidential Information' means all data and information (including that which has been orated by Idea Originator and/or heard by Consultants, even if not via Idea Originator) relating to the business and management of the Idea Originator (regardless of whether said 'Confidential Information' has received patents, copyrights, trade secrets, or any other form of protection), including but not limited to, the following:

   a. 'Customer Information' which includes names of customers of the Idea Originator, their representatives, all customer contact information, contracts and their contents and parties, customer services, data provided by customers and the type, quantity and specifications of products and services purchased, leased, licensed or received by customers of the Idea Originator;

   b. 'Intellectual Property' which includes information relating to the Idea Originator's proprietary rights prior to any public disclosure of such information, including but not limited to the nature of the proprietary rights, production data, technical and engineering data, technical concepts, test data and test results, simulation results, the status and details of research and development of products and services, and information regarding acquiring, protecting, enforcing and licensing proprietary rights (including patents, copyrights and trade secrets);

   c. 'Marketing and Development Information' which includes marketing and development plans of the Idea Originator, price and cost data, price and fee amounts, pricing and billing policies, quoting procedures, marketing techniques and methods of obtaining business, forecasts and forecast assumptions and volumes, and future plans and potential strategies of the Idea Originator which have been or are being discussed;

   d. 'Business Operations' which includes internal personnel and financial information of the Idea Originator, vendor names and other vendor information (including vendor characteristics, services and agreements), purchasing and internal cost information, internal services and operational manuals, external business contacts including those stored on social media accounts or other similar platforms or databases operated by the Idea Originator, and the manner and methods of conducting the Idea Originator's business;

   e. 'Product Information' which includes all specifications for products of the Idea Originator as well as work product resulting from or related to work or projects performed or to be performed for the Idea Originator or for clients of the Idea Originator, of any type or form in any stage of actual or anticipated research and development;

   f. 'Production Processes' which includes processes used in the creation, production and manufacturing of the work product of the Idea Originator including but not limited to, formulas, patterns, molds, models, methods, techniques, specifications, processes, procedures, equipment, devices, programs, and designs;

   g. 'Service Information' which includes all data and information relating to the services provided by the

Idea Originator, including but not limited to, plans, schedules, manpower, inspection, and training information;

**h.** 'Proprietary Computer Code' which includes all sets of statements, instructions or programs of the Idea Originator, whether in human readable or machine readable form, that are expressed, fixed, embodied or stored in any manner and that can be used directly or indirectly in a computer ('Computer Programs'); any report format, design or drawing created or produced by such Computer Programs; and all documentation, design specifications and charts, and operating procedures which support the Computer Programs;

**i.** 'Computer Technology' which includes all scientific and technical information or material of the Idea Originator, pertaining to any machine, appliance or process, including but not limited to, specifications, proposals, models, designs, formulas, test results and reports, analyses, simulation results, tables of operating conditions, materials, components, industrial skills, operating and testing procedures, shop practices, know-how and show-how;

**j.** 'Accounting Information' which includes, without limitation, all financial statements, annual reports, balance sheets, company asset information, company liability information, revenue and expense reporting, profit and loss reporting, cash flow reporting, accounts receivable, accounts payable, inventory reporting, purchasing information and payroll information of the Idea Originator; and

**k.** Confidential Information will also include any information that has been disclosed by a third party to the Idea Originator and is protected by a non-disclosure agreement entered into between the third party and the Idea Originator.

**4.** Except as otherwise provided in this Agreement, the Confidential Information will remain the exclusive property of the Idea Originator and will only be used by the Consultants for the Permitted Purpose. The Consultants will not use the Confidential Information for any purpose that might be directly or indirectly detrimental to the Idea Originator or any associated affiliates or subsidiaries.

**5.** The obligations to ensure and protect the confidentiality of the Confidential Information imposed on the Consultants in this Agreement and any obligations to provide notice under this Agreement will survive the expiration or termination, as the case may be, of this Agreement and those obligations will last indefinitely.

**6.** The Consultants may disclose any of the Confidential Information:

**a.** to such employees, agents, representatives and advisors of the Consultants that have a need to know for the Permitted Purpose provided that:

**i.** the Consultants have informed such personnel of the confidential nature of the Confidential Information;

    **ii.** such personnel agree to be legally bound to the same burdens of non-disclosure and non-use as the Consultants;

    **iii.** the Consultants agree to take all necessary steps to ensure that the terms of this Agreement are not violated by such personnel; and

    **iv.** the Consultants agree to be responsible for and indemnify the Idea Originator for any breach of this Agreement by its personnel.

**b.** to a third party where the Idea Originator has consented in writing to such disclosure; and

**c.** to the extent required by law or by the request or requirement of any judicial, legislative, administrative or other governmental body.

## AVOIDING CONFLICT OF OPPORTUNITIES

**7.** It is understood and agreed that any business opportunity relating to or similar to the Idea Originator's current or anticipated business opportunities coming to the attention of the Consultantsduring the Consultants employment is an opportunity belonging to the Idea Originator. Accordingly, the Consultants will advise the Idea Originator of the opportunity and cannot pursue the opportunity, directly or indirectly, without the written consent of the Idea Originator.

**8.** Without the written consent of the Idea Originator, the Consultants further agree not to:

    **a.** solely or jointly with others undertake or join any planning for or organization of any business activity competitive with the current or anticipated business activities of the Idea Originator; and

    **b.** directly or indirectly, engage or participate in any other business activities which the Idea Originator, in their reasonable discretion, determines to be in conflict with the best interests of the Idea Originator.

## NON-SOLICITATION

**9.** Any attempt on the part of the Consultants to induce others to leave the Idea Originator's employ, or any effort by the Consultants to interfere with the Idea Originator's relationship with their other employees and contractors would be harmful and damaging to the Idea Originator. The Consultants agree that from the date of this Agreement, the Consultants will not in any way, directly or indirectly:

    **a.** induce or attempt to induce any employee or contractor of the Idea Originator to quit their

employment or retainer with the Idea Originator;

**b.** otherwise interfere with or disrupt the Idea Originator's relationship with their employees and contractors;

**c.** discuss employment opportunities or provide information about competitive employment to any of the Idea Originator's employees or contractors; or

**d.** solicit, entice, or hire away any employee or contractor of the Idea Originator.

## NON-COMPETITION

**10.** Other than through employment with a bona-fide independent party, or with the express written consent of the Idea Originator, which will not be unreasonably withheld, the Consultants will not be directly or indirectly involved with a business which is in direct competition with the particular business line of the Idea Originator.

**11.** From the date of this Agreement, the Consultants will not divert or attempt to divert from the Idea Originator any business the Idea Originator had enjoyed, solicited, or attempted to solicit, from their customers, prior to termination or expiration, as the case may be, of the Employment.

## OWNERSHIP AND TITLE

**12.** The Consultants acknowledge and agree that all rights, title, and interest in any Confidential Information will remain the exclusive property of the Idea Originator. Accordingly, the Consultants specifically agree and acknowledge that the Consultants will have no interest in the Confidential Information, including, without limitation, no interest in know-how, copyright, trademarks or trade names, notwithstanding the fact that the Consultants may have created or contributed to the creation of that Confidential Information.

**13.** The Consultants do hereby waive any moral rights that the Consultants may have with respect to the Confidential Information.

**14.** The Consultants agree to immediately disclose to the Idea Originator all Confidential Information developed in whole or in part by the Consultants during the term of their interactions with Idea Originator and/or Employment and to assign to the Idea Originator any right, title, or interest the Consultants may have in the Confidential Information. The Consultants agree to execute any instruments and to do all other things reasonably requested by the Idea Originator (including during and after the term of the Employment) in order to vest more fully in the Idea Originator all ownership rights in those items transferred by the Consultants to the Idea Originator.

## REMEDIES

**15.** The Consultants agree and acknowledge that the Confidential Information is of a proprietary and confidential nature and that any disclosure of the Confidential Information to a third party in breach of this Agreement cannot be reasonably or adequately compensated for in money damages and would cause irreparable injury to the Idea Originator. Accordingly, the Consultants agree that the Idea Originator is entitled to, in addition to all other rights and remedies available to Idea Originator at law or in equity, an injunction restraining the Consultants, any of Consultants' personnel, and any agents of the Consultants, from directly or indirectly committing or engaging in any act restricted by this Agreement in relation to the Confidential Information.

## RETURN OF CONFIDENTIAL INFORMATION

**16.** The Consultants agree that, upon request of the Idea Originator, or in the event that the Consultants cease to require use of the Confidential Information, or upon expiration or termination of this Agreement, or the expiration or termination of the Employment, the Consultants will turn over to the Idea Originator all documents, disks or other computer media, or other material in the possession or control of the Consultants that:

    **a.** may contain or be derived from ideas, concepts, creations, or trade secrets and other proprietary and Confidential Information as defined in this Agreement; and/or

    **b.** is connected with or derived from the Consultants' services to the Idea Originator.

## NOTICES

**17.** In the event that the Consultants are required in a civil, criminal, or regulatory proceeding to disclose any part of the Confidential Information, the Consultants will give to the Idea Originator prompt written notice of such request so the Idea Originator may seek an appropriate remedy or alternatively to waive the Consultants' compliance with the provisions of this Agreement in regards to the request.

**18.** If the Consultants lose or make unauthorized disclosure of any of the Confidential Information, the Consultants will immediately notify the Idea Originator and take all reasonable steps necessary to retrieve the lost or improperly disclosed Confidential Information, and/or to rectify the situation as is applicable, necessary, and sufficient.

**19.** Any notices or delivery required in this Agreement will be deemed completed when hand-delivered,

delivered by agent, or seven (7) days after being placed in the post, postage prepaid, to the parties at the addresses contained in this Agreement or as the parties may later designate in writing.

20. The addresses for any notice to be delivered to any of the parties to this Agreement are as follows:

    **a.** Drew A. Speckman

    *1475 Catamount Rd, Fairfield, CT 06824*

    **b.** Raymone Radi, Cosimo Fabrizio

    *109 Dryden Road, APT G1*,    *75 Arnold Terrace, South Orange, NJ*

## REPRESENTATIONS

21. In providing the Confidential Information, the Idea Originator makes no representations, either expressly or impliedly as to its adequacy, sufficiency, completeness, correctness or its lack of defect of any kind, including any patent or trademark infringement that may result from the use of such information.

## TERMINATION

22. This Agreement will automatically terminate on the date that the Consultants' Employment with the Idea Originator terminates or expires, as the case may be. Except as otherwise provided in this Agreement, all rights and obligations under this Agreement will terminate at that time.

## ASSIGNMENT

23. Except where a party has changed its corporate name or merged with another corporation, this Agreement may not be assigned or otherwise transferred by either party in whole or part without the prior written consent of the other party to this Agreement.

## AMENDMENTS

24. This Agreement may only be amended or modified by a written instrument executed by both the Idea Originator and the Consultants.

## GOVERNING LAW

**25.** This Agreement will be construed in accordance with and governed by the laws of State of New York.

## ADDITIONAL PROVISIONS

**26.** Should a company (or any comparable business entity) be formed, in New York or otherwise, it will be subject to any and all provisions as outlined in this Agreement.

## GENERAL PROVISIONS

**27.** All subsequent copies of this Agreement are equally valid.

**28.** Any errors--grammatical, spelling, punctuation, tense, capitalization (including that which has been shown, throughout this Agreement, to indicate a particular party or stipulation, role, or anything else of comparable nature), or anything else of comparable nature, do not invalidate this Agreement or any specific function within it.

**29.** Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

**30.** The clauses, paragraphs, and subparagraphs contained in this Agreement are intended to be read and construed independently of each other. If any part of this Agreement is held to be invalid, this invalidity will not affect the operation of any other part of this Agreement.

**31.** The Consultants are liable for all costs, expenses, and expenditures including, and without limitation, the complete legal costs incurred by the Idea Originator in enforcing this Agreement as a result of any default of this Agreement by the Consultants.

**32.** The Idea Originator and the Consultants acknowledge that this Agreement is reasonable, valid, and enforceable. However, if a court of competent jurisdiction finds any of the provisions of this Agreement to be too broad to be enforceable, it is the intention of the Idea Originator and the Consultants that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable, bearing in mind that it is the intention of the Consultants to give the Idea Originator the broadest possible protection against disclosure of the Confidential Information.

**33.** No failure or delay by the Idea Originator in exercising any power, right, or privilege provided in this Agreement will operate as a waiver, nor will any single or partial exercise of such rights, powers, or privileges preclude any further exercise of them or the exercise of any other right, power, or privilege

provided in this Agreement.

34. This Agreement will inure to the benefit of and be binding upon the respective heirs (including family and friends), executors, administrators, successors and assigns, as the case may be, of the Idea Originator and the Consultants.

35. This Agreement constitutes the entire agreement between the parties and there are no further items or provisions, either oral or otherwise.

**IN WITNESS WHEREOF** Drew A. Speckman, and Raymone Radi, Cosimo Fabrizio, have duly affixed their signatures under hand and seal on this 28th day of October, 2018.

WITNESS: ADAM SHEHABUDDIN          Drew A. Speckman

WITNESS: JEAN TENG          Raymone Radi, Cosimo Fabrizio

**EXHIBIT C**

# Non-Disclosure, Work Agreement

between

DREW A. SPECKMAN

and

REZA MADHAVAN

Mr. SPECKMAN has retained the help of Mr. MADHAVAN regarding a music-based, learning application company, RapStudy.

Any and/or all ideas and/or information discussed in any and/or all related conversations and/or communications—past and/or potentially forthcoming—will remain exclusively between the two parties: SPECKMAN (and/or those involved with RapStudy at present or in the future) and MADHAVAN, unless otherwise expressly stated, in writing, by SPECKMAN.

Any and/or all materials produced—past and/or potentially forthcoming—by MADHAVAN, and/or discussed with MADHAVAN, are the sole property of SPECKMAN unless otherwise expressly stated, in writing, by SPECKMAN.

Further, SPECKMAN (and/or those involved with RapStudy at present or in the future) have the ability to use any and/or all ideas and/or information from any and/or all related conversations and/or communications—past and/or potentially forthcoming—for any and/or all RapStudy-related reasons. MADHAVAN may not use said ideas, nor said information—nor the aforementioned materials produced—for purposes other than those associated with RapStudy, unless otherwise expressly stated, in writing, by SPECKMAN.

**Signed:**

DREW A. SPECKMAN

REZA MADHAVAN

*(Print name)*

*(Print name)*

*(Signature)*

*(Signature)*

November 12, 2019

November 12, 2019

*(Date)*

*(Date)*

**EXHIBIT D**

# Non-Disclosure, Work Agreement

between

DREW A. SPECKMAN (Founder of RapStudy)

and

ADRIAN W. LEE

Mr. SPECKMAN has retained the help of Mr. LEE regarding a music-based, learning application company, RapStudy.

Any and/or all ideas and/or information discussed in any and/or all related conversations and/or communications—past and/or potentially forthcoming—will remain exclusively between the two parties: SPECKMAN (and/or those involved with RapStudy at present or in the future) and LEE, unless otherwise expressly stated, in writing, by SPECKMAN.

Further, SPECKMAN (and/or those involved with RapStudy at present or in the future) has the ability to use any and/or all ideas and/or information from any and/or all related conversations and/or communications—past and/or potentially forthcoming—for any and/or all RapStudy-related reasons. LEE may not use said ideas, nor said information, for purposes other than those associated with RapStudy, unless otherwise expressly stated, in writing, by SPECKMAN.

Moreover, any and/or all materials produced—past and/or potentially forthcoming—by LEE, and/or discussed with LEE, are the sole property of SPECKMAN, unless otherwise expressly stated, in writing, by SPECKMAN.

Signed:

DREW A. SPECKMAN

*Drew A Speckman*

*(Print name)*

*(Signature)*

*November 5, 2019*

*(Date)*

ADRIAN W. LEE

*Adrian W. Lee*

*(Print name)*

*(Signature)*

*November 5, 2019*

*(Date)*

**EXHIBIT E**

TO: Drew A. Speckman
FROM: Adrian Lee, Cosimo L. Fabrizio, Jake McEvoy and Reza Madhavan

## NOTICE OF MISCONDUCT
May 3, 2021

---

**OVERVIEW**

This notice is a formal acknowledgement of a complaint raised by Claire Choi, Head of Design, against Drew Speckman, Co-Founder and CEO. Cosimo, Reza, Adrian and Jake (referred to as the Core team for the duration of this notice) were recently notified by Claire that she and Drew had a consensual romantic relationship during the Fall of 2020. The relationship was kept entirely secret from Core team members until April 25, 2021. This notice provides a timeline of significant events, a synthesis of key issues and proposed set of next steps in response to these circumstances.

We recognize this is undeniably a difficult situation for everyone involved and want to make it clear that our objective is to ensure rapStudy's success. We believe that this letter will help play a significant role in ensuring that the company overcomes this situation.

**TIMELINE OF SIGNIFICANT EVENTS**

On Sunday, April 25, Claire called Cosimo to notify him that she and Drew had a consensual romantic relationship in the early Fall 2020. The romantic relationship ended in late October. Unfortunately, as she describes, there were many instances in which she was made uncomfortable by Drew following the conclusion of their relationship to such an extent that she requested 2 leaves of absences from the company. After her conversation with Cosimo on the 25th, Claire additionally spoke to Reza that evening. Claire, Reza and Cosimo then spoke again on the following day, April 26th, in person, where Claire provided substantial details regarding the nature of her relationship with Drew and the sources of her discomfort. By the end of the day, Adrian and Jake had been filled in by Claire and Cosimo had reached out to Celia Bigoness to seek advice on how to best handle the situation. On April 27th, the Core team spoke with Drew in an attempt to hear his side of the story. Celia and Claire were updated about the conversation. The Core team spoke with Drew again on May 1st to express their individual views on the situation and ask more pressing questions to Drew.

**KEY ISSUES**

While many points of concern have surfaced through dialogues with both Claire and Drew, the key issues of this situation in the eyes of Core team are bulleted below:

   1. **Inability To Separate Work And Personal Lives**
   While expressed to different extents by Drew and Claire, both acknowledged that their personal relationship had an effect on their professional one. Claire and Drew have had tense exchanges on a number of design and branding team calls, sometimes forcing members of the Core team in an uncomfortable position by having to serve as intermediaries between the two. Despite her best efforts to maintain a professional

relationship, on numerous occasions, Drew responded to professional interactions in a work environment with unprofessional points of concern regarding his personal relationship with Claire.

### 2.  Poor Judgement And Misconduct That Caused Harm To rapStudy

While Drew and Claire mutually agreed to enter this relationship, the Core team holds Drew to a higher standard of responsibility given his status as Co-Founder and CEO of the company. Drew's inability to foresee that a private relationship with a member of rapStudy's design team could lead to professional issues is deeply concerning. This poor judgement ultimately caused harm to rapStudy, as the relationship devolved to a point in which Claire was made so uncomfortable by Drew that she had to leave her active status with the company, affecting our ability to meaningfully advance our brand, design and product objectives. This harm is compounded by the fact that three of Claire's close friends who also work on the design team were made aware of the situation before the Core team was, and have since had both their perception of Drew, and therefore the broader leadership of the company, altered.

### 3.  Violation Of Trust

At its inception, Drew and Claire mutually agreed to keep their relationship private. Eventually, Claire felt compelled to tell a few of her close friends, three of whom were also working on rapStudy's design team at the time. Claire told Drew she had shared this with her friends, to which Drew became upset. On at least one occasion, Claire approached Drew and expressed her desire to share their secret with Cosimo and other members of the Core team. Drew expressed disapproval with the idea and also expressed to Claire that there would be negative consequences to the company by her being forthcoming. At the very least, Drew expressed that he did not want Claire to share her story. This is troubling to the Core team particularly when viewed in the context of Drew's formal authority in the company as Co-Founder and CEO. Further, Drew did not see fit to, on his own initiative, inform the Core team of this relationship despite the situation clearly taking a negative turn with material impacts on work as seen with Claire requesting to take multiple leaves of absences due to Drew's conduct.

## NEXT STEPS

In response to this situation, the Core team agrees that rapStudy's operations cannot continue as the status quo. In the best interest of the company, we request that, beginning as soon as possible, Drew take a leave of absence until August 8, 2021, at which point the Core team will assess Drew's ability to reintegrate into company operations. During this break, we would expect Drew to cease any and all rapStudy related work and focus instead on reflection. This break would allow rapStudy's operations to continue at a critical juncture, give all parties affected by this situation time to meaningfully process, and, most importantly, help team members regain trust and comfort in our relationships and work environment.

Furthermore, we would like to make it clear that upon the completion of this break, we are not comfortable with Drew remaining as CEO of rapStudy. Having Drew remain as CEO despite his actions and poor decision making would not be in the best interest of the company. In tandem,

we would like to freeze existing conversations related to compensation for the time being, as we anticipate changes to team structure and delegation of responsibilities.

We appreciate that these requests do not constitute an exhaustive list of all the changes that may be implemented at rapStudy in response to this situation, nor does it fully articulate the specifications of Drew's leave of absence. Instead, we see the points detailed above as being the most immediate and significant for the advancement of the company by meaningfully moving this process along.

As stated before, this is undeniably a difficult situation for everyone involved. Our objective is to ensure rapStudy's success and we believe this notice is an important step forward for the company.

Best,
Adrian, Cosimo, Jake and Reza

**EXHIBIT F**

 Gmail

**Drew A. Speckman <drewaspeckman@gmail.com>**

---

## Security alert for rapstudyinc@gmail.com
5 messages

---

**Google** <no-reply@accounts.google.com>      Tue, May 11, 2021 at 11:30 AM
To: drewaspeckman@gmail.com

This is a copy of a security alert sent to **rapstudyinc@gmail.com**.
drewaspeckman@gmail.com is the recovery email for this account. If you
don't recognize this account, disconnect it.



### Your password was changed

   rapstudyinc@gmail.com

---

The password for your Google account rapstudyinc@gmail.com was
changed. If you didn't change it, you should recover your account.

You can also see security activity at
https://myaccount.google.com/notifications

You received this email to let you know about important changes to your Google Account and services.
© 2021 Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

---

**Google** <no-reply@accounts.google.com>      Tue, May 11, 2021 at 11:31 AM
To: drewaspeckman@gmail.com

This is a copy of a security alert sent to **rapstudyinc@gmail.com**.
drewaspeckman@gmail.com is the recovery email for this account. If you
don't recognize this account, disconnect it.



# iPhone was signed out

 rapstudyinc@gmail.com

---

If you didn't sign out on this device, someone else is using your account. Check and secure your account now.

Check activity

You can also see security activity at
https://myaccount.google.com/notifications

[Quoted text hidden]

---

**Google** <no-reply@accounts.google.com>        Tue, May 11, 2021 at 11:31 AM
To: drewaspeckman@gmail.com

 This is a copy of a security alert sent to rapstudyinc@gmail.com.
drewaspeckman@gmail.com is the recovery email for this account. If you
don't recognize this account, **disconnect** it.



# Recovery phone was changed for your linked Google Account

 rapstudyinc@gmail.com

---

The recovery phone for your account was changed. If you didn't change it, you should check what happened.

Check activity

You can also see security activity at
https://myaccount.google.com/notifications

[Quoted text hidden]

---

**Google** <no-reply@accounts.google.com>
To: drewaspeckman@gmail.com

Tue, May 11, 2021 at 11:31 AM

 This is a copy of a security alert sent to rapstudyinc@gmail.com.
drewaspeckman@gmail.com is the recovery email for this account.



# Recovery email was changed for your linked Google Account

rapstudyinc@gmail.com

The recovery email for your account was changed. If you didn't change it, you should check what happened.

Check activity

You can also see security activity at
https://myaccount.google.com/notifications

[Quoted text hidden]

---

**Drew A. Speckman** <drewaspeckman@gmail.com>
To: Jason Sunshine <jsunshine@pessahgroup.com>, Maurice Pessah <maurice@pessahgroup.com>

Tue, May 11, 2021 at 2:48 PM

Locked out

[Quoted text hidden]

--

Drew
(203) 540-9722

**EXHIBIT G**

## ACCOUNT INFORMATION
## CHECKING ACCOUNT



Tompkins Trust Company

---

## ACCOUNT TITLE AND ADDRESS

rapStudy Inc
111 Dryden Rd Apt 8K
Ithaca, NY 14850

| ACCOUNT OPEN DATE | ACCOUNT NUMBER | OWNERSHIP TYPE | PRODUCT NAME | INITIAL DEPOSIT |
|---|---|---|---|---|
| August 3, 2020 | 8120118820 | Corporation | Small Business Checking | |

## BUSINESS ENTITY INFORMATION

| | | | |
|---|---|---|---|
| Name: | rapStudy Inc | Business Filing State: | NY |
| Address: | 111 Dryden Rd | Date Established: | August 3, 2020 |
| | Apt8k | Resolution Date: | August 3, 2020 |
| | Ithaca, NY 14850 | **Business does not engage in Internet Gambling.** | |
| E-Mail Address: | drew@rapstudy.com | | |

**DEFINITIONS.** "You," "your," and "account owner" refer to the Customer, whether or not there are one or more Customers named on the account, and the terms "we," "us," and "our" refer to the Bank, Tompkins Trust Company.

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

**ACKNOWLEDGMENT.** By signing this document, you acknowledge that you have opened the type of account designated above. The undersigned certify that all information provided to the Bank is true and accurate. As the account is in the name of a business entity, you acknowledge that you are acting on behalf of the business entity, and with respect to which you have legal authority to transact business. All signers authorize this Bank to make inquiries from any consumer reporting agency, including a check protection service, in connection with this account.

Your signature acknowledges the receipt of the appropriate Account Agreement for the type of account designated above and that you agree to be bound by the Account Agreement. You acknowledge that you have received the following document(s):

- Substitute Check Policy Disclosure
- Funds Availability Policy Disclosure
- Schedule of Fees
- Privacy Policy (if a copy was not previously provided to you)

**One Signer Required for Withdrawals**

rapStudy Inc

By: Drew Speckman          Date    8/3/20
Its: CEO

---

| | |
|---|---|
| **Signer:** | Drew Speckman |
| Address: | 111 Dryden Rd |
| | Apt 8k |
| | Ithaca, NY 14850 |
| Title/Capacity: | CEO |

Identification Document
DL - Driver's License: 139164769
ID Issuing Location:  DMV
ID Issue Date:  July 30, 2015
ID Expiration:  January 3, 2022

| | |
|---|---|
| Tax ID Number: | 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 |
| Date of Birth: | January 3, 1998 |
| Cell Phone: | (203)540-9722 |
| Email Address: | Drew@rapstudy.com |
| Unique Identifier: | Kennedy |

**TAXPAYER IDENTIFICATION NUMBER (T.I.N.) CERTIFICATION**

85-0523083

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. citizen or other U.S. person (defined in the instructions for the IRS Form W-9), and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item **2** above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item **2** does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN.

**Signature of U.S. person:**

Exemptions (see IRS Form W-9 instructions):

Exempt payee code (if any) _____
Exemption from FATCA reporting code (if any) _____

_Drew Speckman_                          5/3/20
Drew Speckman                          Date

**BANK REPRESENTATIVE SIGNATURE**

_Thomas Cannon_                          8/3/2020
By: Thomas Cannon                          Date
Its: Universal Banker

**EXHIBIT H**

# [GitHub] You've been removed from rapstudy's repositories Inbox

**GitHub** May 11
to drewspecks ⌄



GitHub

## You've been removed from the **@rapstudy** organization

Hi **@drewspecks**,

You've been removed as a collaborator on rapstudy's repositories.

You no longer have access to the following repositories:

rapstudy/rapstudy-web

Manage your GitHub email preferences
Terms • Privacy • Log in to GitHub



GitHub, Inc.
88 Colin P Kelly Jr Street
San Francisco, CA 94107

↩ Reply    ➡ Forward